2025 IL App (2d) 240430-U
No. 2-24-0430
Order filed August 4, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 23-DV-239 |
| ROBERT J. PIECZYKOLAN, | ) ) ) | Honorable Bolling W. Haxall III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We remand for the trial court to conduct, under *People v. Krankel*, a preliminary inquiry into defendant's allegation in his *pro se* posttrial "Motion to Appeal" that his trial counsel was ineffective for failing to introduce exculpatory evidence. Despite the title of defendant's motion and his assertion to the trial court that he wanted to appeal rather than pursue other relief, the court should have inquired into defendant's ineffectiveness claim.

¶ 2   After a bench trial, defendant, Robert J. Pieczykolan, was convicted of domestic battery

(720 ILCS 5/12-3.2(a)(1) (West 2022)) and sentenced to one year of probation. On appeal, he

argues that the trial court should have treated his *pro se* postjudgment motion as a claim of

ineffective assistance of counsel and, per *People v. Krankel*, 102 Ill. 2d 181 (1984), considered whether to appoint new counsel to represent him on the claim. We remand.

¶ 3                               I. BACKGROUND

¶ 4      We summarize the pertinent trial evidence. Krstyna Pieczykolan testified as follows. On May 24, 2023, she resided with her sons, Peter and defendant, in her house in Mundelein. The house had an attached garage. Early in the evening, she and Peter were home when she saw defendant's girlfriend, Claire Karberg, pull over onto the driveway, drop off defendant, and drive off. Krstyna went to the kitchen and prepared dinner for Peter. Peter entered the kitchen. Krstyna walked from the kitchen down the hallway to the door that led into the garage (garage door). She opened the garage door and saw defendant sitting on the step next to the garage door.

¶ 5      Krstyna testified that she reminded defendant that she had told him that she did not want Karberg on her property. Defendant said nothing but slammed the garage door extremely hard. Krstyna opened the garage door again and told defendant not to slam it. Defendant approached her, grabbed her left arm, and "tossed [her] to the floor." Peter started chasing defendant. Krstyna, in pain, got up and went into the garage. She saw defendant lying on the driveway. He got to his feet and made a call on his phone. Soon after, the police arrived.

¶ 6      Krstyna testified that, before defendant grabbed her, she did not put her hands on him, push him, or tackle him. She was five feet, three inches tall.

¶ 7      On cross-examination, Krstyna testified that, after she told defendant that she did not want Karberg on the premises, he got up and slammed the garage door. Krstyna did not immediately open the garage door again. She first went into the kitchen and then returned. She opened the garage door and told defendant not to slam it. At that point, defendant grabbed her arm and "tossed

[her] to the floor." Peter was sitting in the kitchen. After the confrontation, Krstyna did not call the police because she did not want to press charges against her son.

¶ 8    Peter testified as follows. On May 24, 2023, at about 8 p.m., he was in the kitchen eating dinner. Krstyna went to the garage. Peter heard her tell defendant that she did not want Karberg parking in the driveway. Peter then heard a door slam shut very loudly. Peter began walking down the hallway to the garage door. He heard Krstyna tell defendant not to slam the garage door. The garage door slammed a second time. Peter did not see what was happening, but he heard a commotion, and then he heard the garage door slam a third time. Peter positioned himself to see what was happening. He saw defendant grab Krstyna and throw her to the ground. Peter ran after defendant and punched him three or four times. He then pushed defendant away and told him to leave. He pushed defendant again; defendant fell onto the driveway. Before defendant pushed Krstyna, Peter did not see her hit, tackle, or push defendant.

¶ 9    On cross-examination, Peter testified that he did not see defendant take hold of Krstyna; defendant was already holding her when Peter saw defendant throw her down. Krstyna landed on her back. Defendant never punched or pushed Peter.

¶ 10    Juan Servin, a Mundelein police officer, testified that he and other officers were dispatched to the scene. Servin approached defendant, who was standing on the driveway. Defendant looked agitated. He told Servin that Krstyna had pushed and tackled him. Inside the house, Servin talked briefly with Krstyna, then exited and spoke further with defendant. Defendant described the incident further, but his statements were inconsistent. After speaking with Peter and consulting the other officers, Servin arrested defendant.

¶ 11    On cross-examination, Servin testified that defendant was the one who called the police. Defendant had a swollen eye and said that Peter punched him there. Defendant was inconsistent,

initially stating that the incident occurred in the laundry room, but later claiming that it happened near the garage door. Servin did not ascertain the distance between the laundry room and the garage door.

¶ 12    The State rested.

¶ 13    For defendant, Karberg testified as follows. On May 24, 2023, at about 7:45 or 8 p.m., she picked up defendant at his home. They drove around, stopped at a gas station to buy cigarettes, and then returned. Karberg dropped defendant off in his driveway, and he entered the garage as she drove off. Shortly after Karberg arrived home, defendant called her and asked for a ride to the hospital.

¶ 14    Karberg testified that, a few days before May 24, 2023, she and defendant started to enter the house. Krstyna charged at them, stopped two feet away, and started screaming at them in Polish. Karberg did not speak Polish and did not understand what Krstyna said. Peter, who was standing nearby, insulted Karberg. Karberg grabbed defendant's arm and demanded that they leave.

¶ 15    Defendant testified as follows. On May 24, 2023, he left for work at 7:30 a.m. and returned home at 7:30 p.m. He entered the house through the front door and went to the garage to clean his equipment and smoke. After about 15 minutes, he needed more cigarettes, so he called Karberg to pick him up. When she arrived, they went to a gas station and returned 15 minutes later. Defendant entered the garage to smoke and continue cleaning his equipment. He sat on the step outside the garage door. Karberg was in her car on the driveway.

¶ 16    Defendant testified that Krstyna opened the garage door and told defendant that she did not want "that whore" coming to her house. Defendant closed the garage door. He did not stand up or say anything to Krstyna. She opened the garage door and started yelling at him again.

Defendant closed the garage door, got up, and began walking through the garage toward the driveway. Krstyna opened the garage door and continued to yell at him. He noticed that she was "walking backwards." She turned but did not watch where she was going. Defendant saw her falling, so he entered the hallway and reached out to her. However, she fell to the ground, landing on her backside. Krstyna said, " 'Look at what he just did. He just shoved me.' " Defendant turned around, and Peter punched him in the eye. Defendant walked backward through the hallway leading to the garage door. Krstyna and Peter then "tackled [him] through the garage door." Defendant got up and made it through the main door of the garage, but Peter kept attacking him and shoved him to the ground. Defendant called the police.

¶ 17    Defendant testified that at no point during the May 24, 2023, incident did he "place [his] hands on [Krstyna] to shove her," "grab her *** and pick her up off the ground," or "slam her into a wall."

¶ 18    Defendant testified that, on the Saturday preceding May 24, 2023, Karberg visited and, while she was backing her car up in the driveway, Peter yelled at her from his car. Peter then exited his car and started yelling at defendant. Defendant walked away.

¶ 19    On cross-examination, defendant testified that, when Krstyna and Peter tackled defendant, she held on to the garage door and did not fall. Defendant did not know why Peter tackled him. Defendant remained completely "peaceful" throughout the confrontation. He never slammed the door in Krstyna's face. Defendant was also "peaceful" during the incident on the Saturday before May 24, 2023.

¶ 20    The parties rested. After hearing arguments, the trial court found defendant guilty. The court determined that defendant's testimony was "not believable," and "often made up."

¶ 21    The trial court denied defendant's posttrial motion.  On June 20, 2024, the court sentenced defendant to 12 months' probation.

¶ 22    On July 15, 2024, defendant, now proceeding *pro se*, filed a document titled "Motion to Appeal."  The motion stated, in full:

"In my case there was numerous evidence [*sic*] that my attorney refused to present to show my innocence in the matter.  I feel that if all video was shown I would be exonerated from [*sic*] the charges.  The arresting officer said under oath that I should not have been arrested as well."

¶ 23    On July 22, 2024, more than 30 days after the entry of the judgment, defendant, still proceeding *pro se*, appeared in court before a new judge.  The following colloquy ensued:

"THE COURT: ***

And the motion, sir, so there's evidence that your attorney refused to present.

So, sir, essentially *you filed a motion alleging ineffective assistance*.

Sir, are you asking to file an appeal in this case, or are you asking to file something else?

THE DEFENDANT: An appeal.

THE COURT: Okay.  You would need to go down to the clerk's office and ask how you would file an appeal.  Without ruling on the timeliness of this motion, you need to start that process down in the clerk's office.

When you filled out this motion, did you ask them how to take an appeal?

THE DEFENDANT: I did.  And I did the entire process that they asked me to.  I went downstairs, and I went to the state's attorney.  So I would like to—

THE COURT: Actually, that was filed July 15th. Okay.

THE DEFENDANT: So I would like to ask for—

THE COURT: Are you planning to have an attorney assist you in the appeal?

THE DEFENDANT: I need to ask for a public defender due to financial hardship."

(Emphasis added.)

¶ 24    The trial court appointed the Office of the State Appellate Defender to represent defendant on appeal. On July 24, 2024, defendant filed a notice of appeal.

¶ 25     On August 20, 2024, on defendant's motion, we entered an order deeming the *pro se* "Motion to Appeal" a timely notice of appeal and the July 24, 2024, notice an effective amended notice of appeal.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, defendant requests that we remand for the trial court to inquire per *Krankel* into his *pro se* motion's allegation of ineffective assistance of counsel. Defendant argues that, under *Krankel*, whenever a *pro se* defendant brings a posttrial allegation that his trial counsel was ineffective, the trial court must inquire whether the allegation warrants the appointment of new counsel to argue the claim and, if so, must appoint new counsel and hold a hearing on the merits of the allegation.

¶ 28    The State responds that defendant is barred from raising his *Krankel* argument here, under the principles of invited error and waiver and due to his later request to characterize the motion as a valid notice of appeal. The State argues alternatively that defendant's *pro se* motion was insufficient to raise a claim of ineffective assistance of counsel.

¶ 29    Whether the trial court properly conducted a preliminary *Krankel* inquiry is a question of law, which we review *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33. The appointment of new

counsel is not automatically required. *Id.* ¶ 35. Rather, when the defendant makes the requisite claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the claim. *Id.*; *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel and may deny the claim. *Roddis*, 2020 IL 124352, ¶ 35. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id.*

¶ 30     We address the State's procedural arguments. Invited error occurs when a party does not merely fail to object to an alleged error but actively invites or acquiesces in it. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44. Invited error creates an estoppel such that a defendant may not raise the alleged error as a basis for reversal on appeal, because to allow him to do so would "be unfair to the State and encourage defendants to become duplicitous." *Id.* Waiver is " 'the voluntary relinquishment of a known right.' " *People v. Hughes*, 2015 IL 117242, ¶ 37 (quoting *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320 n.2 (2008)).

¶ 31     In supporting its procedural arguments, the State notes that defendant's *pro se* motion is titled "Motion to Appeal." The State notes further that, when the trial court asked defendant whether he wished to file an appeal or "something else," defendant replied, "An appeal," and explained that he had gone to the clerk's office and "the state's attorney" and "did the entire process that they asked [him] to." Thus, the State argues first that defendant may not claim error in the trial court's refusal to make a preliminary *Krankel* inquiry, because he invited the error by inducing the court to treat his "motion" as a notice of appeal. Secondly, the State argues that, by requesting an appeal instead of seeking further trial court action, defendant waived any right to relief by the trial court. The State argues third that, by moving this court to recognize defendant's

*pro se* motion as a notice of appeal, he may not now argue that the motion was one for relief in the trial court.

¶ 32      In his response, defendant notes that the State's recitation of the pertinent facts is somewhat selective. First, defendant's *pro se* motion was titled "Motion to Appeal." Nonetheless, the motion clearly raised a claim that defendant's trial counsel had rendered ineffective assistance by failing to introduce exculpatory evidence. Indeed, at the hearing, the trial court stated that defendant was "alleging ineffective assistance." Defendant invokes the familiar principle that the character of a motion is determined by its substance, not its title. See *Savage v. Pho*, 312 Ill. App. 3d 553, 559 (2000). We agree that the titling of the motion is of no consequence.

¶ 33      Second, defendant notes, the circumstances militate strongly against concluding that, at the hearing on his *pro se* motion, defendant either invited the alleged error or voluntarily relinquished his right to a preliminary *Krankel* hearing. Defendant observes that the trial court *knew* that defendant was raising a clear claim of ineffective assistance of counsel. Thus, the authority that we have cited required the court to make a preliminary *Krankel* inquiry or, at the very least, to inform defendant that he had the right to a *Krankel* proceeding. Defendant notes that the trial court never told defendant he had this choice, but asked only whether he intended to file an appeal or "something else." Nothing in the record suggests that the *pro se* defendant had any legal sophistication, much less any knowledge of *Krankel*. (Indeed, at the hearing, he apparently confused the circuit court clerk's office with the state's attorney's office.) Finally, defendant contends that the mere fact that his motion was later deemed a valid notice of appeal (at his request) does not prove that he may not now argue that the trial court erred in refusing to inquire into the claim that was raised in the motion.

¶ 34    Defendant concludes as follows.  First, the trial court erred by not following the legally required *Krankel* procedure, even absent defendant's request for relief by the trial court.  Second, there was no invited error or waiver, because defendant's decision to file an appeal following the hearing was induced by the trial court's failure at the hearing to act on its recognition that defendant's motion triggered a duty to hold a preliminary *Krankel* hearing or at least to inform defendant that he had the right to have the court consider his claim.  See *People v. Washington*, 2015 IL App (1st) 131023, ¶ 14 (where the defendant withdrew an oral motion alleging ineffective assistance only because the trial court erroneously held that the motion must be in writing, the appellate court would not apply invited error doctrine or waiver).  Third, there was no waiver because, aside from the *Washington* rationale, there is no proof that defendant *knowingly* relinquished his right to a *Krankel* hearing—in fact, there is no reason to believe he even knew that he *had* such a right.  See *People v. Robinson*, 66 Ill. App. 3d 601, 607-08 (1978) (party claiming waiver has burden of proof).  Finally, the fact that defendant's motion was later deemed a proper notice of appeal did not limit the issue to be raised on appeal or undo the circumstances presented to the trial court when it heard the motion.

¶ 35    We agree with defendant's arguments.  We add that the invocation of invited error would be especially inappropriate here because there is no basis to suspect that defendant is (or was) working any unfairness to the State or acting duplicitously.  Defendant filed his *pro se* motion only after the final judgment had been entered, so he gained no advantage at trial or sentencing.  He was proceeding out of confusion and incomplete information, disadvantages not mitigated by the trial court's failure to inform him of his right to a preliminary *Krankel* hearing.  By the same token, defendant did not knowingly relinquish his right to press his ineffectiveness claim in the trial court.

¶ 36    Thus, we reject the State's procedural arguments for affirmance. We stress that the trial court was obligated to ensure that defendant understood that he had the right to have the court inquire into his claim. Indeed, the court would have been well advised to make the *Krankel* inquiry *sua sponte* because, as we will explain, defendant's motion sufficiently raised the claim of ineffective assistance.

¶ 37    In its alternative ground for affirmance, the State argues that the *pro se* motion did not raise the claim adequately enough even to require a preliminary *Krankel* hearing. The State relies on authority that, to obtain a preliminary *Krankel* hearing, a defendant must make a "clear claim" of ineffectiveness. *People v. Bates*, 2019 IL 124143, ¶ 33; *People v. Ayres*, 2017 IL 120071, ¶ 18. Relying on several pre-*Ayres* opinions, the State contends that the allegations of defendant's motion were insufficiently specific to raise a clear claim.

¶ 38    The State's specificity argument is obsolete in view of *Ayres*, which the State cites for general propositions while ignoring its primary holding. In *Ayres*, on the same day that his counsel filed a motion to reconsider sentence, the defendant mailed a *pro se* petition "alleging 'ineffective assistance of counsel.' " *Ayres*, 2017 IL 120071, ¶ 6. The allegation was "without any factual support." *Id.* ¶ 9. The trial court denied the motion to reconsider the sentence without considering the petition. *Id.* ¶ 6. On appeal, the supreme court remanded the cause for a preliminary *Krankel* hearing. *Id.* ¶ 26. The court held that specific information was not needed to obtain a preliminary *Krankel* hearing on the *pro se* defendant's conclusional but unambiguous claim: "[W]hen a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18.

¶ 39    *Ayres* controls.  Defendant's motion brought a clear claim of ineffective assistance of trial counsel, as the trial court acknowledged at the hearing.  Thus, he satisfied his modest burden for obtaining a preliminary *Krankel* inquiry.  We must remand for a preliminary *Krankel* hearing.

¶ 40                              III. CONCLUSION

¶ 41    For the reasons stated, we remand the cause to the circuit court of Lake County for a preliminary *Krankel* hearing and such further proceedings as are appropriate.

¶ 42    Remanded with directions.